## Commonwealth v. Township of Armagh

*Robert Yuhnke,* for Commonwealth.
*David M. Barron,* for appellant.

WATERS, Member, December 28, 1872.—This matter comes before the board as an appeal from an order the Department of Environmental Resources, hereinafter referred to as the "Department," issued to Armagh Township, ordering it to construct and operate a joint sewage and treatment facility together with Brown Township. The joint treatment facility is not to discharge into Honey Creek. Brown Township has not appealed from the order issued concerning it.

This appeal raises for the first time before this

board, the question of the extent of the Department's discretionary authority to order municipalities of this State to engage in joint or regional ventures in solving municipal sewage disposal problems.

A petition to intervene was filed by Trout Unlimited, Inc., a nonprofit corporation interested in preserving Honey Creek, Mifflin County, Pa., in its natural state. The petition was granted.

## FINDINGS OF FACT

1. The Township of Armagh ("Armagh") is situate in Mifflin County, Pa., and includes the villages of Milroy, Naginey and Shrader.

2. The Township of Brown ("Brown") is situate in Mifflin County, Pa., contiguous with and to the south-west of Armagh and includes the village of Reedsville.

3. Armagh and Brown are located on the watershed of the Kishacoquillas Creek.

4. No municipal sewage collection and treatment facilities presently exist in either Brown or Armagh.

5. Under date of July 6, 1972, the Department of Environmental Resources ("Department") issued separate orders to Brown and Armagh requiring the construction and operation of a joint sewage system and treatment facility which would not discharge into Honey Creek.

6. Honey Creek flows on the surface from a point in the immediate vicinity of Alexander Cavern in Armagh, southeastward, through Brown, and has a confluence with the Kishacoquillas Creek at the Village of Reedsville.

7. Honey Creek contains a very diverse fish and insect population and supports the natural reproduction of brown trout. Natural trout reproduction in a stream of this size, and in this part of the State, is unusual. This stream is unique in that it originates

from a direct water discharge having a constant, year-round temperature.

8. Honey Creek is stocked, both preseason and in-season, by the Pennsylvania Fish Commission. The stream is very heavily fished and has been the subject of a special project by Trout Unlimited, the members of which have devoted hundreds of manhours to the construction of stream improvements, the preparation of a fishing area for children, the collection of debris in and about the stream and other desirable activities.

9. The discharge of sewage treatment plant effluent into Honey Creek will have adverse effects on fish and aquatic life in the stream.

10. Adverse effects would not occur if the discharge were to a stream having a considerably larger flow than Honey Creek.

11. The flow of Kishacoquillas Creek is considerably larger than the flow of Honey Creek.

12. A single treatment plant serving both Brown and Armagh, with its discharge to Kishacoquillas Creek, is economically feasible, based on the evidence available at this time.

13. If the villages of Shrader and Naginey are not included in the system, the total capital cost of sewage systems for Brown and Armagh, featuring a single-joint treatment plant at Reedsville, will be approximately the same as the total capital cost of systems featuring separate plants in Brown and Armagh.

14. If the villages of Shrader and Naginey are included in the system, at least two technologically feasible alternatives exist to pipe sewage collected in Armagh to a joint treatment plant located in Reedsville.

15. One such alternative consists of the construction of a interceptor pipe along Honey Creek from Armagh to Reedsville. The added capital cost of this

alternative, if spread evenly over all users of the system, would be less than $30 per year per dwelling unit.

16. The cost of upgrading a joint treatment facility will be less than the cost of upgrading two separate facilities.

17. A single treatment facility, discharging into Kishacoquillas Creek, will preserve Honey Creek as a unique water resource.

18. A single treatment facility discharging into Kishacoquillas Creek is consistent with the concept of comprehensive water quality management and pollution control.

19. Penns Creek Chapter of Trout Unlimited, Inc., has undertaken several programs involving many hours of labor in order to improve the recreational and environmental quality of Honey Creek in Mifflin County, Pa.

20. The Penns Creek Chapter of Trout Unlimited, Inc., is opposed to a sewage treatment facility which would empty into Honey Creek as proposed by appellant.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the parties and subject matter of this appeal.

2. There has been, and will continue to be, unlawful discharges into the waters of the Commonwealth in Armagh Township in violation of The Clean Streams Law unless action is taken by the Department to prevent the same.

3. Section 203 (a) and (b) of The Clean Streams Law of June 22, 1937, P. L. 1987, art. F, sec. 1, 35 PS §§691.-203 (a) and (b), as amended, authorizes the department to issue an order to appellant requiring the construction and operation of a sewer system and sewage treatment facility.

4. The Department has not abused its discretion by its order of July 6, 1972.

## DISCUSSION

The issues raised by this appeal are important, but not difficult on this record. Although doubt is raised by the testimony as to the exact issues appellant desires to resolve by this appeal, it seems clear that the major issue is that referred to in his trial brief: "The issues raised in this appeal are almost exclusively questions involving the exercise of discretion of Daniel B. Drawbaugh, Chief, Division of Water Supply and Sewage, . . ." The authority of the Department of Environmental Resources is not challenged by this appeal. It is contended that the discretion granted to the Department was abused by Mr. Drawbaugh in the order appealed from.

It is clear that in reviewing an act of the Department in an area where generally discretion is given to it, we must find that such action or order is arbitrary, capricious or unreasonable before we can properly disregard it: Upper Darby National Bank v. Smith, 67 Dauph. 3; Eways v. Reading Parking Authority, 385 Pa. 592.

The Clean Streams Law of June 22, 1937, P. L. 1987, arts. 1 and 5, as amended July 31, 1970, P. L. 653, No. 222, 35 PS §691.5 provides that:

"(a) The board and the department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

"(1) Water quality management and pollution control in the watershed as a whole;

"(2) The present and possible future uses of particular waters;

"(3) *The feasibility of combined or joint treatment facilities;* (Italics supplied.)

"(4) The state of scientific and technological knowledge;

"(5) The immediate and long-range economic impact upon the Commonwealth and its citizens.

"(b) The board shall have the power and its duty shall be to:

"(1) Formulate, adopt, promulgate and repeal such rules and regulations and issue such orders as are necessary to implement the provisions of this act.

"(2) Establish policies for effective water quality control and water quality management in the Commonwealth of Pennsylvania and coordinate and be responsible for the development and implementation of comprehensive public water supply, waste management and other water quality plans."

We have reviewed the order of the department in the light of all of the testimony presented by both parties, and we are unable to find any abuse of discretion therein.

Our legislature, which enunciates the public policy of our State, has given broad powers to the Department to make such determination and require the very actions on the part of municipalities as are here in question. It is not a function of this board to strip away those powers.

It is true that Armagh Township, appellant, does persuasively argue that it is feasible to construct separate facilities to serve the two municipalities. There are three hitches, however, in their proposition. First, the authority to determine how to best solve the

sewage treatment problems of Brown and Armagh Townships does not reside in Armagh Township. Municipalities are, after all, not independent of, but are completely dependent upon, our legislature for their powers. Secondly, the question before us is not whether appellant has devised a feasible plan for dealing with the sewage problem of the area, but whether the department has exceeded or abused its discretionary powers. Third, and finally, the appellant ignores the main thrust of the Department's argument which is concern for the preservation of Honey Creek in its present state.

In conclusion, we feel that the order issued by the department on July 6, 1972, is fair and reasonable and clearly falls within the powers of the department.

## ORDER

And now, December 28, 1972, the order issued by the Department of Environmental Resources on July 6, 1972, is hereby affirmed, and the appeal of Armagh Township is dismissed.

## CONCURRING OPINION

MALIN, Chairman, December 28, 1972.—Appellant in this case initially objected to the Commonwealth's order requiring it to "agree" with Brown Township to create and operate a joint sewage treatment facility. The record would appear to indicate that this legal contention on the invalidity of an order to "agree" was not pressed at final hearing. However, I consider it important to deal with the question inasmuch as I view it as a critical issue and of some importance to the Commonwealth and the many municipalities around the State who are served with orders under The Clean Streams Act to enter into joint

sewage-treatment agreements with other municipal bodies and to "agree" on the contracts necessary to do so. Such contracts usually involve the allocation of construction costs, engineering costs, and rates to be paid for sewage treatment by subscribers in different townships. I have little doubt that under the applicable statutory authority, the Commonwealth could order municipal bodies to enter into specific contracts which contain all of the applicable details and then have any dispute appealed to the board and the courts for a decision. However, the Commonwealth does not as a matter of policy make such detailed orders. It leaves it to the parties to "agree." The Commonwealth at this juncture claims it does not have the personnel or expertise to make the studies required in order to issue detailed orders. It orders the parties to agree to hire engineering firms to make the detailed studies, upon which the parties should then pass their negotiations on cost allocations, etc.

Sufficient doubt as to legality and feasibility of the Commonwealth procedures existed so that House Bill 41 was drafted and introduced into the Legislature ostensibly to obviate any problems and aid regionalization. However, it has yet to be enacted.

We are not aware of, nor have we ever been cited to any authority in either Federal or State law holding that parties may be forced to agree to any type of contract. The Labor Management Relations Act, 1947, 29 U.S.C. §141, et seq., which probably is considered to go as far as any act, merely required labor and management to bargain in "good faith." It also has elaborate procedures for fact-finding to ultimately aid in settlement. Compulsory arbitration statutes involving policemen, firemen and municipalities do not force the parties to "agree"; in the absence of agree-

ment, they force a settlement in order to maintain vital public service.

The ultimate sanction for failure to "agree" to an administrative order would be civil contempt imposed by the courts. But, I have serious doubts if a court would be able to assign culpability to the point where it could, consistent with due process, impose a contempt penalty.

The Commonwealth Court in the case of Commonwealth v. Derry Township, 673 Civil Docket, in an order signed by Judge Kramer on July 31, 1972, ordered agreements in default of which the court appointed a master who would consider the matter and report to the court, which would then impose an agreement. However, no agreement has yet been reached or imposed. It appears that this basic issue was not raised in that case.

In what appears to be a little-used statute, municipalities are empowered to obtain a court order to be permitted to have another municipality accept or treat sewage, after the court acts on a report of viewers, who will set a proper fee for the service: July 17, 1901, P. L. 668, 53 PS §2332. This would appear to indicate the legislative policy to force agreement by arbitration. We believe there are less legal impediments to imposing such settlements on municipal bodies than private parties. Municipalities are, after all, mere creatures of the State deriving all powers from it. I believe that the Commonwealth can, and indeed must, for financial and technical reasons insist on regional sewage treatment facilities. Federal financing, for example, is basically available only for regional treatment facilities.

I would squarely hold that, in view of the critical nature of the Commonwealth's water pollution problems and the need to meet them as soon as possible,

and because the most practical method for setting up regional treatment facilities is agreement among the parties, orders to parties compelling negotiations leading to agreement within a limited period of time and under a threat of a board or court are valid. In the absence of good faith negotiations of the parties leading to settlements, this board or the courts would have the power to appoint masters or viewers to resolve any impediments to ultimate agreement.